UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WEBSTER BANK, N.A., | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | 3:14-cv-00135-WWE |
| | : | |
| DIEBOLD INC., | : | |
|     Defendant. | : | |

### MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO DISMISS

In this action, plaintiff Webster Bank, N.A. alleges that defendant Diebold Inc. breached their ATM services agreement by failing to reimburse Webster for its losses caused by the conduct of Diebold's subcontractor, Mount Vernon Money Center ("MVMC"), after MVMC misappropriated deposits belonging to Webster. Defendant has moved to dismiss based on the applicable statute of limitations. For the following reasons, defendant's motion will be granted.

### BACKGROUND

The following background is taken from the allegations of the amended complaint [Doc. #43], which are accepted as true for purposes of this decision.

Pursuant to an ATM services agreement, Webster hired Diebold to service Webster's ATMs and to provide cash handling services. Cash handling services included collecting, replenishing, transporting and storing cash pulled from Webster's ATMs on a daily basis. The agreement provided that Diebold could subcontract the cash handling services and that Webster would fully cooperate with a subcontractor "to the same extent as it would be required to do so if the [s]ervices were being performed by Diebold." Diebold agreed that, aside from certain express exceptions, Diebold would be fully responsible for the performance of its subcontractors.

Diebold hired subcontractor MVMC to perform the cash handling services on Diebold's

behalf.  In January and February 2010, Webster determined that MVMC had stolen more than $11 million from Webster.

The parties agreed that any subcontracting relationship would be in substantially the same form as a model subcontract attached as schedule F to the Statement of Work.  However, Diebold failed to enter into such a contract with MVMC.

The model subcontract would have allowed Diebold to train, test and certify MVMC employees.  Diebold would have had the right to audit the books and records of MVMC.  In addition, MVMC would have been required to submit quarterly unaudited financial statements and to comply with security procedures specified by Diebold.

Between 2008 and January of 2010, MVMC transported and stored millions of dollars in deposits pulled from Webster's ATM machines.

Diebold failed to properly monitor MVMC's vaults or to conduct any financial review of MVMC.  Moreover, Diebold failed to ensure that MVMC would obtain insurance coverage that would include, among other things, crime insurance and/or fidelity bond coverage to protect against theft by a principal or owner.

On January 29, 2010, Webster discovered that millions of dollars of its money was missing from MVMC's vault.  Webster alerted Diebold, and Diebold's head of security conducted a taped interview of MVMC's President, Robert Egan, during which Egan admitted that he had misappropriated Webster's funds to disguise other shortfalls.  Egan stated that the total shortfall was between $20 and $50 million.

On February 8, 2010, Egan and MVMC's Chief Operating Officer, Bernard McGarry, were arrested for their roles in the alleged scheme.

The Statement of Work agreement between Webster and Diebold provided that "Diebold shall be fully responsible for the performance of its sub-contractors."

On February 17, 2010, Webster sent Diebold a letter demanding full reimbursement for its losses, then in excess of $11 million. On February 26, 2010, Deibold denied responsibility and refused to reimburse Webster.

Webster alleges Diebold failed to perform three obligations under their agreement: (1) it failed to enter into the required subcontract pursuant to § 12 of the Statement of Work; (2) it failed to ensure and verify that MVMC obtained insurance pursuant to § 12 of the Statement of Work; (3) it failed to reimburse Webster for its losses caused by MVMC's conduct pursuant to § 8 of the Statement of Work.

## DISCUSSION

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984). When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. Hishon v. King, 467 U.S. 69, 73 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). A plaintiff is obliged to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The fourth amendment to the parties' ATM services agreement provides:

> Any action arising or resulting, directly or indirectly related to Mount Vernon Money Center, from the performance or non-performance of Diebold, shall be brought within four (4) years after the cause of action occurs or be forever barred.

Diebold argues that Webster's breach of contract action is time barred.  Diebold contends that each of the alleged breaches accrued on or before January 29, 2010.  As Webster did not bring the instant action until January 31, 2014, it missed the four year window by at least two days.

The parties did not explicitly specify that Diebold would be responsible for reimbursing Webster in the event that MVMC misappropriated funds.  Rather, Webster brings this action based on Section 8(a) of the Statement of Work, which states that "Diebold shall be fully responsible for the performance of its sub-contractors."  Webster argues that Diebold breached its duty of responsibility by failing to reimburse Webster.  Am. Compl. ¶ 64.  Moreover, Webster contends that Diebold's non-performance occurred on February 26, 2010, when Diebold refused to reimburse Webster.

Webster strains through the use of layman's dictionary definitions to distinguish "occur" as used in the parties' service agreement from "accrue" as a legal term of art, arguing that occur includes a subjective element (i.e., knowledge of the claim by the non-defaulting party).  The Court is not persuaded.  Indeed, pursuant to the "occurrence rule" of civil procedure, "a limitations period begins to run when the alleged wrongful act or omission occurs, rather than when the plaintiff discovers the injury.  This rule apples, for example, to most breach-of-contract claims."  Black's Law Dictionary 1109 (8th ed. 2004).

Moreover, under New York law[1]:

> [T]he statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury.  Thus, knowledge of the occurrence of the wrong on the part of the plaintiff is not necessary to start the Statute of Limitations running in a contract action.

Ely-Cruikshank Co., Inc. v. Bank of Montreal, 81 N.Y.2d 399, 403 (1993).

Here, Diebold's failures to (1) enter into the required subcontract with MVMC; (2) ensure that MVMC obtained insurance; and (3) be fully responsible for the performance of MVMC all occurred by the time Webster realized its funds were missing on January 29, 2010.  The Court finds no merit to Webster's argument that any claims were prevented from accruing while Diebold acted in a fiduciary capacity because "parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree."  Maxim Group LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 307 (S.D.N.Y. 2010).  As settled New York contract law marks accrual from the contractual breach, this action will be dismissed based on Webster's failure to file within the applicable four-year statute of limitations.  See Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993).

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss [Doc. # 44] is GRANTED.  The Clerk is instructed to close this case.

Dated this 23rd day of January, 2015, at Bridgeport, Connecticut.

        /s/Warren W. Eginton        
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE

---

[1] The ATM services agreement provides that it "shall be governed by and interpreted in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions thereof."  Agreement § 15(d).